**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| G. HOLDINGS LTD., <br><br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD. and SAMSUNG ELECTRONICS AMERICA INC., <br><br> Defendant. | Case No. 2:20-cv-00342-JRG <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF G. HOLDINGS LTD.'S OPENING CLAIM CONSTRUCTION BRIEF**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................... 1

II.     BACKGROUND OF THE TECHNOLOGY ............................................... 1

III.    LEGAL PRINCIPLES ............................................................................... 3

IV.     LEVEL OF ORDINARY SKILL IN THE ART ......................................... 6

V.      THE DISPUTED CLAIM TERMS ........................................................... 7

        A. Order of Steps ('333 Patent Claim 11; '294 Patent Claim 12) ........................................................................................................... 7

        B. "a data conveyance switching element operatively linked to said electronic circuit,. . . . said switching element being in an activated state upon an activation cue having been received by said data transceiver, and being in an inactive state when no activation cue was received by said data transceiver" ('294 Patent Claim 1) ...................................... 11

        "a switching element operatively linked to said electronic circuit and . . . being in a default inactive state …. . . if an activation cue is received at one of said communication ports, changing the state of said switching element from its default inactive state to an activated state ('294 Patent Claim 11 and 13) ................................................................. 11

        "a data conveyance switching element. . .  operatively linked to said electronic circuit, said switching element being assigned a first state upon an activation cue having been received by said cue receiver, and being assigned a second state when no activation cue was received by said cue receiver"  ('333 Patent Claim 1) ........................................... 11

        "a data conveyance switching element . . . capable of being in either one of a first and a second state. . . if an activation cue is received at said cue receiver, assigning said first state to said switching element, while if no activation cue is received at said cue receiver, assigning said second state to said switching element" ('333 Patent Claim 12) ........... 11

        C. "data exchange device" ('333 Patent, Claims 1 and 11; '294 Patent, Claims 1, 8, 12, and 16) ..................................................................................................... 17

        D. "invariable activation command" ('333 Patent, Claims 1 and 11; '294 Patent, Claims 1, 12, and 18) ............................................................................................. 20

        E. "a control device operatively linked to said electronic circuit, with an invariable activation command being issued when said control device is selectively triggered" ('333 Patent Claim 1) ....................................................................................... 21

        "wherein upon said control device being selectively triggered to issue and [*sic*] invariable activation command" ('333 Patent Claim 1) ................................................... 21

        "a user-triggered control device operatively linked to said electronic circuit, said user-triggered control device configured to be operated by a user via one of a button, a keypad, a tactile screen, and a biometric parameter detector, and after being operated issue an

invariable activation command, with said invariable activation command being issued when said control device is selectively triggered by the user" ('294 Patent Claim 1) .. 21

"a user-triggered control device operatively linked to said electronic circuit, said user-triggered control device configured to be operated by a user via one of a button, a keypad, a tactile screen, and a biometric parameter detector, and after being operated issue an invariable activation command, with said invariable activation command being issued when said control device is triggered by the user" ('294 Patent Claim 10) .................. 21

"wherein upon said control device being selectively triggered by the user to issue said invariable activation command" ('294 Patent Claims 1 and 10) .................................... 21

F. "conveyed toward a close proximity" ('294 Patent Claims 8 and 16) ....................................................................................................................... 24

G. "upon" ('333 Patent Claim 1; '294 Patent Claims 1 and 10) ....................................................................................................................... 26

H. "wherein upon said control device being selectively triggered to issue and invariable activation command: ................................................................................................. 27

if said switching element is in said activated state, a data exchange will be initiated through the instrumentality of said data transceiver for exchanging data between said electronic circuit and an external data exchange device; ................................................ 27

if said switching element is in said inactive state, data will be conveyed from said electronic circuit to said user interface device for communicating information to the portable electronic device holder." ('333 Patent Claim 1) ............................................ 27

"wherein upon said control device being selectively triggered by the user to issue said invariable activation command: .................................................................................... 27

if said switching element is in said first state, a first data conveyance operation will be initiated through the instrumentality of said first data transceiver for sending data from said electronic circuit to the first external data exchange device over said first communication link; and .............................................................................................. 27

if said switching element is in said second state, a second data conveyance operation will be initiated through the instrumentality of said second data transceiver for sending data from said electronic circuit to the second external data exchange device over said second communication link." ('294 Patent Claim 1) ............................................................... 27

"wherein upon said control device being selectively triggered by the user to issue said invariable activation command: .................................................................................... 27

if an activation cue was received by said cue receiver, said electronic circuit will accomplish said first data conveyance operation to convey data from said electronic circuit to said first data transceiver for transmitting data through said first data transceiver; and ............................................................................................................ 27

if no activation cue was received by said cue receiver, said electronic circuit will accomplish said second data conveyance operation to convey data from said electronic circuit to said second data transceiver for transmitting data through said second data transceiver." ............................................................................................................... 27

ii

('294 Patent Claim 10)...................................................................................................... 27

VI.   CONCLUSION........................................................................................................................ 29

# TABLE OF AUTHORITIES

## Cases:

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ............................................................................. 5

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ............................................................................. 6

*ArcelorMittal France v. AK Steel Corp.*,
  700 F.3d 1314 (Fed. Cir. 2012) ............................................................................. 5

*Baldwin Graphic Sys., Inc. v. Siebert*,
  512 F.3d 1338 (Fed. Cir. 2008) .......................................................................... 5, 8

*Chrimar Sys., Inc. v. Alcatel-Lucent USA, Inc.*,
  No. 6:15-CV-163-JDL, 2016 WL 1237156 (E.D. Tex. Mar. 28, 2016) .................................. 24

*Comark Commc'ns, Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998) ............................................................................. 4

*Creative Internet Advert. Corp. v. Yahoo! Inc.*,
  No. 6:07-cv-00354, 2008 WL 5061625 (E.D. Tex. Nov. 24, 2008) .............................. 26, 28

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) ............................................................................. 5

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
  899 F.3d 1291 (Fed. Cir. 2018) ........................................................................ 14, 18

*Evicam Int'l, Inc. v. Enforcement Video, LLC*,
  No. 4:16-cv-105, 2016 WL 6470967 (E.D. Tex. 2016) ................................................. 24

*Exxon Research & Eng'g Co. v. United States*,
  265 F.3d 1371 (Fed. Cir. 2001) ............................................................................. 5

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
  607 F.3d 776 (Fed. Cir. 2010) ............................................................................. 6

*Interactive Gift Express, Inc. v. CompuServe Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) ............................................................................. 5

*Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*,
  649 F.3d 1350 (Fed. Cir. 2011) ............................................................................. 6

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005) ................................................................ 21, 22, 23

*Johnson Worldwide Assocs. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999) ................................................................................ 4

*Linear Tech. Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004) ........................................................................... 14

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ................................................................................. 3

*Mars, Inc. v. H.J. Heinz Co., L.P.*,
    377 F.3d 1369 (Fed. Cir. 2004) ............................................................................. 9

*MasterMine Software, Inc. v. Microsoft Corp.*,
    874 F.3d 1307 (Fed. Cir. 2017) .........................................................21, 22, 23

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*,
    520 F.3d 1367 (Fed. Cir. 2008) ........................................................................... 22

*Microsoft Corp. v. i4i Ltd. Partn'p*,
    564 U.S. 91 (2011) ................................................................................................. 5

*MTD Products Inc. v. Iancu*,
    933 F.3d 1336 (Fed. Cir. 2019) ................................................................ 13, 14, 18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ........................................................................... 26

*Personalized Media Comm. v. Int. T. Comm*,
    161 F.3d 696 (Fed. Cir. 1998) ............................................................................. 13

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................................................. 4

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013) ................................................................... 5, 9, 28

*TriMed, Inc. v. Stryker Corp.*,
    514 F.3d 1256 (Fed. Cir. 2008) ........................................................................... 13

*UltimatePointer, L.L.C. v. Nintendo Co.* ,
    816 F.3d 816 (Fed. Cir. 2016) ............................................................................. 22

*United States Gypsum Co. v. National Gypsum Co.*,
   74 F.3d 1209 (Fed. Cir. 1996) ................................................................................. 5

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ............................................................................. 26

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ................................................................................. 4

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ............................................. 6, 13, 14, 16, 17, 18

*Zeroclick, LLC v. Apple Inc.*,
   891 F.3d 1003 (Fed. Cir. 2018) ........................................................................ 13, 17

**<u>Statutes:</u>**

35 U.S.C. § 112 ................................................................................... 6, 11, 13, 17, 19

35 U.S.C. § 282 ................................................................................................... 11

## I.     INTRODUCTION

Plaintiff G. Holdings Ltd. ("G. Holdings") asserts U.S. Patent No. 7,628,333 ("the '333 Patent") and U.S. Patent No. 9,022,294 ("the '294 Patent") (collectively, "the Asserted Patents") against Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung" or "Defendants").  G. Holdings contends that Samsung's Samsung Pay as implemented in certain Samsung mobile devices infringe the Asserted Patents.  Through the claim construction process, Samsung asks the Court to rewrite the plain and clear language of the claims of the Asserted Patents in ways that presumably would create non-infringement arguments. Samsung does this in three ways:  (1) by attempting to import limitations, such as unsupported temporal restrictions, into the claims; (2) by replacing words in the claims with different, more narrow words that Samsung would prefer; and (3) by misapplying well settled law regarding 35 U.S.C. § 112, ¶¶ 2 and 6.  This is an improper approach to construing claims and should be rejected. For these reasons and as set forth more fully below, G. Holdings respectfully requests that the Court adopt its proposed construction for the disputed terms.

## II.     BACKGROUND OF THE TECHNOLOGY

The Asserted Patents are related and claim inventions relating to a portable electronic device that is capable of alternate data conveyance operations responsive to an invariable activation command.  The Asserted Patents describe embodiments that include a portable electronic device containing a control device capable of being selectively triggered by the portable electronic device holder (*e.g.*, button pushing, entering PIN, or scanning fingerprint).  And in use, upon control device being selectively triggered by the portable electronic device holder, an activation command will be issued by the control device to an electronic circuit, in reaction to which data will be conveyed within the portable electronic device, and possibly additionally

1

conveyed to and from the portable electronic device, according to a pre-determined data conveyance operation. The exact nature of this data conveyance operation will depend on the state of the switching element. *See, e.g.*, Miller Dec. Ex. 1 at 6:42-51. In particular, the '333 Patent describes a system that allows for a user triggered data exchange (*e.g.*, POS and online financial transactions) utilizing a portable electronic device and an external data exchange device when a switching element is in an activated state and allows for data to be conveyed to a user interface of the portable electronic device when the switching element is in an inactive state. The '294 Patent describes an apparatus that allows for a user triggered data exchange operation on a cell phone to be initiated with a first external data exchange device (*e.g.*, POS system) or with a second external data exchange device (*e.g.*, transaction server) depending on the state of the switching element.

Figures 1 and 2 of the Asserted Patents illustrate an example of how the alternate data conveyance may be operated:



Fig. 1    Fig. 2

The Asserted Patents describe Figure 1 as illustrating a communication link being established between an electronic device transceiver 18 and the transceiver 9a of the data exchange device 9. The communication link can be a contact or contactless link. Transceiver 18 is also a cue receiver, whereby an activation cue can be received by electronic device 10 from data exchange device transceiver 9a. This activation cue is in the form of a data communication of a specific type which

2

will be recognized by electronic device 10 as an activation cue.  Figure 2 illustrates an embodiment where an electronic circuit 14 comprises a microchip that will include switching element 44b, which can be a series of instructions programmed onto the microchip whereby the data conveyance operation will be automatically executed according to whether or not an activation cue was received by transceiver 18.  According to the specification, at any given time, switching element 44b will consequently be in either one of the two following states: a) an activated state wherein an activation cue was received by transceiver 18; or b) an inactive state wherein no activation cue was received by transceiver 18.  Figure 3 of the Asserted Patents further describe the data exchange device being capable of communication through multiple communication modes.  Similarly, Figure 4 of '294 Patents illustrates different types of data exchange devices using different and/or multiple communications modes for data conveyance with a cell phone.

G. Holdings is asserting claims 1, 2, 4, 5, 6, 11, and 13 of the '333 Patent and claims 1, 2, 3, 4, 8, 9, 10, 12, 16, 17, and 18 of the '294 Patent. G. Holdings accuses Samsung of directly infringing the Asserted Patents through Samsung's Samsung Pay as implemented on portable devices, including, for example, Samsung's Galaxy line of smartphones and smartwatch.  Samsung Pay is a mobile payment application and digital wallet service offered by Samsung.  Samsung Pay works in-store, in-app, and online.  Instead of having a user enter credit card numbers for in-app or online purchases, Samsung Pay allows a user to select the application at checkout and authenticate the purchase with a fingerprint, PIN, or iris scan on the Samsung smartphone or smartwatch.

## III.    LEGAL PRINCIPLES

Determining the proper meaning of patent claims is a question of law that exclusively belongs to the Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir.

1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  During claim construction, a court first looks at the words of the claims themselves to define the scope of the patented invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  In determining the meaning of the claims, "there is a 'heavy presumption in favor of the ordinary meaning of claim language.'"  *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).  Ordinary meaning is defined as the "meaning that term would have to a person of ordinary skill in the art in question at the time of invention."  *Phillips*, 415 F.3d at 1313.  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id*.

Among the hierarchy of evidentiary sources relied upon for claim interpretation, the specification is the "single best guide" to the meaning of a disputed term other than claims themselves and is usually dispositive of the analysis.  *Id*. at 1315.  "Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quotations omitted).  The file history is also relevant; however, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Phillips*, 415 F.3d at 1317.  "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term [and] it is improper to rely on extrinsic evidence."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  Extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language," *Phillips*, 415 F.3d at 1317, and "[h]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its

4

particular context, which is the specification." *Id*. at 1321.  Further, extrinsic evidence "may not be used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1320 (Fed. Cir. 2012).  Moreover, "[a] claim construction that excludes the preferred embodiment is rarely, if ever, correct." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378-79 (Fed. Cir. 2013).

In regard to method claims, the law is clear that "although a method claim necessarily recites the steps of the method in a particular order, as a general rule the claim is not limited to performance of steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin Graphic Sys., Inc. v. Siebert*, 512 F.3d 1338, 1345 (Fed. Cir. 2008); *see also Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001).  To determine whether a specific order is required, courts look "to the claim language to determine if, as a matter of logic or grammar, [the steps] must be performed in the order written." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003).  If not, courts "next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction." *Id*. at 1370 (internal citations omitted).  If it does not, there is no order requirement.  *See id*.

A party seeking to invalidate a patent must overcome a presumption that the patent is valid.  *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. Partn'p*, 564 U.S. 91, 97 (2011); *United States Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996).  This presumption places the burden on the challenging party to prove the patent's invalidity by clear and convincing evidence.  *Microsoft*, 564 U.S. at 97; *United States Gypsum Co.*, 74 F.3d at 1212.  Close questions of indefiniteness "are properly resolved in favor of the patentee." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005); *Exxon*

*Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1380 (Fed. Cir. 2001).  It is the defendant's burden to prove indefiniteness and a defendant must "show by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area."  *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010).

"Whether certain claim language invokes § 112, ¶ 6 is an exercise in claim construction and is therefore a question of law."  *See Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).   The Federal Circuit explains the means-plus-function analysis as follows:

> The overall means-plus-function analysis is a two-step process. Naturally, there is some analytical overlap between these two steps. In the first step, we must determine if the claim limitation is drafted in means-plus-function format. As part of this step, we must construe the claim limitation to decide if it connotes sufficiently definite structure to a person of ordinary skill in the art, which requires us to consider the specification (among other evidence). In the second step, if the limitation is in means-plus-function format, we must specifically review the specification for corresponding structure. Thus, while these two structure inquiries are inherently related, they are distinct.

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296 (Fed. Cir. 2014), *overruled on other grounds by Williamson*, 792 F.3d 1339.

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

G. Holdings submits that a person having ordinary skill in the art would have had at least a bachelor's degree in electrical engineering, computer science, applied mathematics, or an equivalent field, in addition to at least one year of industry experience in mobile hardware and software for mobile devices.  *See* Miller Dec. Ex. 3 at ¶ 26.

6

## V.    THE DISPUTED CLAIM TERMS

### A.  Order of Steps ('333 Patent Claim 11; '294 Patent Claim 12)

| G. Holdings' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary because there is no particular order of steps recited or required except where expressly causally limited in the claim. | Steps must be performed in the order written |

The disputed issue is whether it is appropriate to impose a specific order to the steps of claim 11 of the '333 Patent and claim 12 of the '294 Patent.  Method claim 11 of the '333 Patent reads, in part, as follows (emphasis added):

> A method for data exchange with a portable electronic device … said method comprising the steps of: …
> **awaiting for an activation cue to be received at a predetermined one of said communication ports**;
>> if an activation cue is received at one of said communication ports, changing the state of said switching element from its default inactive state to an activated state; **and**
> **selectively triggering said control device to issue an invariable activation command**, whereby said method will further comprise one of the two following steps:
>> if said switching element is in its activated state, initiating a data exchange with an external data exchange device through at least one of said communication ports; and
>> if said switching element is in its inactive state, conveying data from said electronic circuit to said user interface device for communicating information to the portable electronic device holder.

Method claim 12 of the '294 Patent reads, in part, as follows (emphasis added):

> A method for data conveyance with a cellular phone of the type comprising … said method comprising the steps of:
> **if an activation cue is received at said cue receiver**, assigning said first state to said switching element, while **if no activation cue is received at said cue receiver**, assigning said second state to said switching element; **and**
> **a user selectively triggering said control device to issue an invariable activation command** whereby:
> if said switching element is in said first state, forwarding first data to said first data transceiver for initiating a data exchange operation with a first external data exchange device over a first communication link; and

if said switching element is in said second state, forwarding second data to said second data transceiver for initiating a data exchange operation with a second external data exchange device that is distinct from said first communication link.

G. Holdings does not dispute that a plain reading of the claim requires that certain steps in the claim are causally linked and must be completed in a particular order.  For example, in claim 11 of the '333 Patent, an activation cue must be received before changing the state of the switching element from its default inactive state to an activated state, the switching element must be in its activated state before initiating a data exchange with an external data exchange device, and the switching element must be in its inactive state before conveying data from the electronic circuit to the user interface for communication information to the device holder.

Further, in claim 12 of the '294 Patent, an activation cue must be received at the cue receiver before assigning the first state to the switching element, the switching element will be assigned a second state if no activate cue is received, the forwarding of the first data is causally limited to the switching element being in the first state, and the forwarding of the second data is causally limited to the switching element being in the second state.  The only dispute between the parties is whether the "activation cue" step must occur before the "selectively triggering" step in both claim 11 of the '333 Patent and claim 12 of the '294 Patent—as Samsung proposes.

"[A]s a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin Graphic Sys., Inc*, 512 F.3d at 1345.  Here, the recited method steps do not require that the "activation cue" and "selectively triggering" steps need to be performed in the order recited because the claims do not "explicitly or implicitly" impose such an order, and nothing in the specification or prosecution history imposes an "order-specific construction."  *Id.*  Rather, the language is open-ended because it uses the transitional phrase "comprising."  Such a claim does not exclude additionally, unrecited

8

elements, or method steps.  *See, e.g.*, *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1376 (Fed.

Cir. 2004) (citing M.P.E.P. § 2111.03).  Thus, the language of both claim 11 of the '333 Patent

and claim 12 of the '294 Patent does not preclude the "selectively triggering" step from being

performed before or simultaneously with the "activation cue" step.  There are no explicit or

inherent disclosures in the claims or specification that require a particular order for the "activation

cue" and "selectively triggering" steps.

Samsung's proposed construction should also be rejected because it would exclude

embodiments disclosed in the Asserted Patents.  *SynQor, Inc.*, 709 F.3d at 1378-79.  Specifically,

the specification of the **'**294 Patent describes an embodiment where the user-triggered invariable

activation command is issued and then an activation cue is received to determine the data

conveyance path.  For example, the specification describes that a user could trigger the control

device and then confirm the method of proximity data conveyance by moving the device within a

determined range of the data exchange device.  *See* Miller Dec. Ex 2 at  18:7-59.

> In any event, **one or more additional authorizations could be required between
> the triggering of the control device 114 and the forwarding of the user data
> towards first or second transceiver 120, 122**.  More particularly, it is envisioned
> that upon the control device 114 being triggered to issue its invariable activation
> command, confirmation data would be forwarded from electronic circuit 116 to
> display screen 118 to be displayed thereon.

Miller Dec. Ex. 2 at 18:7-14 (emphasis added).

> In the case where the transaction occurs with a proximity data exchange device 104
> **the user confirmation input device could include a proximity trigger device
> that establishes wireless contact to download information when portable
> electronic device 102 is brought within a determined maximum distance from
> data exchange device 104**.  In other words, instead of being accomplished with a
> confirmation button or the like element on portable electronic device 102, **the
> authorization command would occur automatically when portable electronic
> device 102 is brought by its user within a certain determined maximum
> distance from data exchange device 104**, the proximity trigger device then
> allowing the downloading of the first data to occur from portable electronic device
> 102 to data exchange device 104.  The user of course being aware of this feature on

his portable electronic device 102, **the action of moving portable electronic device 102 would be made voluntarily to complete the data conveyance operation from first transceiver 120 to data exchange device 104**.

Miller Dec. Ex. 2 at 18:41-59 (emphasis added).

Also, the prosecution history of the '294 Patent further supports that the "activation cue" is not required to occur prior to the user-triggered "invariable activation command."  For example, in the March 27, 2012 Amendment and Applicant Arguments, the patentee explains that the "activation cue" and the "invariable activation command" are not required to be temporally linked as Samsung suggests.

> It is recalled that the gist of the present invention is to provide a device that may issue one of two data conveyance operations responsive to an invariable command issued by a user-triggered control device, depending on whether or not an external cue has been received.  This provides the advantages of: (1) the user specifically controlling when the data conveyance operations will occur, since the user will trigger the control device himself; **while** (2) simultaneously avoiding the need for the user to decide which conveyance operation will occur, **since the electronic circuit will decide** this for the user.

Miller Dec. Ex. 4 at p. 12 (emphasis added).  Similarly, in the October 26, 2012 Amendment and Applicant Arguments, the patentee further stated:

> In other words, the invariable activation command generated by the user-triggered control device of the claimed invention is not used to control which data conveyance function is ultimately accomplished.  Instead, it is the **subsequent** presence or absence of the external activation cue that controls which data conveyance function is accomplished.

Miller Dec. Ex. 5 at p. 15 (emphasis added).

Taken in its entirety, the intrinsic record of the patents-in-suit demonstrates that the activation cue and invariable activation command are not temporally tied.  The intrinsic record describes that the activation cue and the invariable activation command may be in any order or nearly simultaneous.

Therefore, a POSITA would understand that the activation cue and the selective triggering to issue an invariable activation command are not necessarily temporally linked in a specific configuration.  *See* Miller Dec. Ex. 3 at ¶ 33.  A POSITA would appreciate that the activation cue could be received before the triggering of the invariable activation command, the triggering of the invariable activation command could proceed prior to the device searching for an activation cue, or the triggering of the invariable activation command could occur nearly simultaneous to the reception of the activation cue.  *Id*.

**B.**   **"a data conveyance switching element operatively linked to said electronic circuit,. . . . said switching element being in an activated state upon an activation cue having been received by said data transceiver, and being in an inactive state when no activation cue was received by said data transceiver" ('294 Patent Claim 1)**

**"a switching element operatively linked to said electronic circuit and . . . being in a default inactive state .... . . if an activation cue is received at one of said communication ports, changing the state of said switching element from its default inactive state to an activated state ('294 Patent Claim 11 and 13)**

**"a data conveyance switching element. . .  operatively linked to said electronic circuit, said switching element being assigned a first state upon an activation cue having been received by said cue receiver, and being assigned a second state when no activation cue was received by said cue receiver"  ('333 Patent Claim 1)**

**"a data conveyance switching element . . . capable of being in either one of a first and a second state. . . if an activation cue is received at said cue receiver, assigning said first state to said switching element, while if no activation cue is received at said cue receiver, assigning said second state to said switching element" ('333 Patent Claim 12)**

| G. Holdings' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.  Alternatively, "data conveyance switching element" means "hardware connected to and/or software running on an electronic circuit that provides switching functionality to enter into a different state for conveying data."<br><br>Not governed by 35 U.S.C. § 112, ¶ 6. | Governed by 35 U.S.C. § 112(6)<br><br>Indefinite due to absence of corresponding algorithm in the specification under 35 U.S.C. §§ 112(2), 112(6).<br><br>Function: being in an activated state upon an activation cue having been received by said data transceiver, and being in an inactive state |

| | |
|---|---|
| To the extent the Court determines the phrase is governed by 35 U.S.C. § 112, ¶ 6:<br><br>Structure:  hardware connected to and/or software running on an electronic circuit<br><br>Function:  provides switching functionality to enter into a different state for conveying data | when no activation cue was received by said data transceiver<br><br>Structure: a decisional logical circuit or a series of instructions programmed onto a microchip or a processor/general purpose computer/microcontroller<br><br>Algorithm: None<br><br>OR<br><br>"data conveyance switching element" shall be construed to mean "element that changes between two alternate data conveyance states" |
| No construction necessary.  Alternatively, "switching element" means "hardware connected to and/or software running on an electronic circuit that provides switching functionality to enter into a different state for conveying data."<br><br>Not governed by 35 U.S.C. § 112, ¶ 6.<br><br>To the extent the Court determines the phrase is governed by 35 U.S.C. § 112, ¶ 6:<br><br>Structure:  hardware connected to and/or software running on an electronic circuit<br><br>Function:  provides switching functionality to enter into a different state for conveying data | Governed by 35 U.S.C. § 112(6)<br><br>Indefinite due to absence of corresponding algorithm in the specification under 35 U.S.C. §§ 112(2), 112(6).<br><br>Function: being in a default inactive state and, if an activation cue is received at one of said communication ports, changing the state of said switching element from its default inactive state to an activated state<br><br>Structure: a decisional logical circuit or a series of instructions programmed onto a microchip or a processor/general purpose computer/microcontroller<br><br>Algorithm: None<br><br>OR<br><br>"switching element" shall be construed to mean "element that changes between two alternate states" |

The parties dispute whether "switching element" and/or "data conveyance switching element" is a means-plus-function term.  As an initial matter, the absence of the word "means" or

of the use of the non-structural generic placeholder "element *for*" from the claim term creates a presumption in favor of G. Holdings that means-plus-function claiming does *not* apply.  *See*, *e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015); *Personalized Media Comm. v. Int. T. Comm*, 161 F.3d 696, 704 (Fed. Cir. 1998); M.P.E.P 2181.  Samsung must overcome this presumption with evidence that the term does not have a "sufficiently definite meaning as the name for structure." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018).

Samsung cannot carry this burden to overcome the presumption, nevertheless, and they only arrive at such a conclusion by ignoring the surrounding claim language, the specification of the Asserted Patents, and its own expert's admissions.  When courts consider whether a POSITA would understand a term as structural or means-plus-function claiming, they must still apply well-understood claim construction principals as they consider the intrinsic and extrinsic evidence. *Zeroclick*, 891 F.3d at 1007.

First, the terms "switching element" and "data conveyance switching element" are not described as functional terms in view of the surrounding claim language.  *See MTD Products Inc. v. Iancu*, 933 F.3d 1336, 1342 (Fed. Cir. 2019) ("In assessing whether the claim limitation is in means-plus-function format, we do not merely consider the introductory phrase (*e.g.*, 'mechanical control assembly') in isolation, but look to the entire passage including functions performed by the introductory phrase.").  For example, the claim language states that the "switching element" and "data conveyance switching element" perform the function of being assigned a state upon an activation cue having been received by the cue receiver and being assigned a second state when no activation cue was received by the cue receiver.  *See TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008) ("Sufficient structure exists [to avoid § 112, ¶6] when the claim

language specifies the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure.").  Moreover, the claim language states that "switching element" and "data conveyance switching element" are operatively linked to the "electronic circuit"—another sufficient structure. *See*, *e.g.*, *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) ("Technical dictionaries, which are evidence of the understandings of persons of skill in the technical arts, plainly indicate that the term 'circuit' connotes structure....The *Dictionary of Computing 75* (4th ed. 1996) defines 'circuit' as 'the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function.'").

Second, the specification confirms that the terms "switching element" and "data conveyance switching element" are structural because it (a) provides examples of a definition of the term, *see MTD Products*, 933 F.3d at 1342; (b) provides examples of "what structures or class of structures fall within the definition of the term," *see Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1298 (Fed. Cir. 2018); and (c) describes how the term interacts with other components of the invention.  *Williamson*, 792 F.3d at 1351.  Here, the specification defines and recites what structures fall within the definition of terms "switching element" and "data conveyance switching element":

> Switching element 44 b can be any type of device allowing data to be conveyed according to alternate data conveyance operations in response to an activation cue being received by transceiver 18 or not, as described hereinafter. According to the embodiment shown in FIGS. 1 and 2, electronic circuit 14 comprises switching element 44 b. In an embodiment wherein electronic circuit 14 comprises a microchip, switching element 44 b can be a series of instructions programmed onto the microchip whereby the data conveyance operation will be automatically executed according to whether or not an activation cue was received by transceiver 18. Alternately, switching element 44 b can comprise a decisional logical circuit.

14

> Generally, switching element 44 b can be a physical structure, a virtual program, or both.

Miller Dec. Ex. 1 at 6:4-17. G. Holding's expert, Dr. Balakrishnan, confirmed that the specification defines the terms "switching element" and "data conveyance switching element" and provides a class of structures, such as a series of instructions programmed onto a microchip, decisional logical circuit, and virtual program, that fall within the definition. *See* Miller Dec. Ex. 3 at ¶ 34. Even Samsung's expert, Dr. Akl, could not dispute that the specification clearly identifies structures that fall within the definition of terms "switching element" and "data conveyance switching element." *See* Miller Dec. Ex. 6. at ¶ 40 ("The specifications of the Asserted Patents disclose that the 'data conveyance switching element' and/or 'switching element' is a decisional logical circuit or a series of instructions programmed onto a microchip or a processor/general computer/microcontroller.").

The specification further describes how the "switching element" and "data conveyance switching element" interact with other components, thereby informing the structural character of the term. For example, the specification, including the figures, generally describes how the "switching element 44b" interacts and connects with other structural components of the inventions, such as "electronic circuit 14," "control device 12," and "transceiver 18" *See*, *e.g.*, Miller Dec. Ex. 1 at Fig. 2, 6:4-26; 6:42-7:3; 9:4-25. The "switching element" or "data conveyance switching element" is described as having a connection to other components of the invention such that, for instance, "switching element 44b" can be in different states (*e.g.*, activate or inactive state and/or first or second state) and the exact nature of the data conveyance operation will depend on the state of "switching element 44b." *See*, *e.g.*, Miller Dec. Ex. 1 at 6:4-26; 6:42-7:3; 9:4-25. Figure 2 of the Asserted Patents illustrates an electronic circuit 14 that includes, among other things, a

15

switching element 44b, which directs the data flow towards an appropriate destination.  *See*, *e.g.*, Miller Dec. Ex. 1 at Fig. 2; 4:24-30.

Samsung's expert's criticism, which is consistent with Samsung's proposed construction, is that the specification does not disclose an algorithm.  However, no disclosure of algorithm is required because the "switching element" and "data conveyance switching element" are sufficient structures and not means-plus-function terms.  Nevertheless, the specification does disclose an algorithm for the switching element.  For example, the specification states that  "switching element 44b can be a series of instructions programmed onto the microchip whereby the data conveyance operation will be automatically executed according to whether or not an activation cue was received by transceiver 18."  *See* Miller Dec. Ex. 1 at 6:9-14; *see also Williamson*, 792 F.3d at 1352 ("The algorithm may be expressed as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.").  A POSITA would understand that this disclosure is logical structure that could be implemented in hardware and/or software as it is a logic algorithm (*e.g.*, if/else or switch statement).  *See* Miller Dec. Ex. 3  at ¶ 34.  Further, the claim language provides an algorithm for the "switching element" and "data conveyance switching element" terms by inclusion of an if/else condition (*e.g.*, "switching element being in an activated state upon an activation cue having been received by said data transceiver, and being in an inactive state when no activation cue was received by said data transceiver").

It is Samsung's burden to overcome the presumption that the "switching element" and "data conveyance switching element" claim terms are means-plus-function terms.  However, all the evidence, including the declaration of Samsung's expert, directly contradicts Samsung's assertion that the terms are means-plus-function terms that would not be considered structure by a POSITA.  Thus, the terms should be afforded their plain and ordinary meaning.  Alternatively, G.

16

Holdings proposes a construction that is consistent with the terms' plain and ordinary meaning as described in the specification and as understood by a POSITA.  *See* Miller Dec. Ex. 3  at ¶ 34.

**C. "data exchange device" ('333 Patent, Claims 1 and 11; '294 Patent, Claims 1, 8, 12, and 16)**

| G. Holdings' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.  Not governed by 35 U.S.C. § 112, ¶ 6.

To the extent the Court determines the phrase is governed by 35 U.S.C. § 112, ¶ 6:

Structure:  external data exchange device

Function:   communicates with the portable electronic device and provide data upload and/or download | Governed by 35 U.S.C. § 112(6)

Function: exchanging data

Structure: an electronic circuit and a data transceiver able to cooperate with a transceiver, including a portable electronic device, a computer, and an interface machine such as an automatic teller machine

OR

"data exchange device" shall be construed to mean "an apparatus that sends and receives data" |

The term "data exchange device" is not a means-plus-function term, as proposed by Samsung.  A presumption against finding a means-plus-function claim also attaches because the terms do not use the word "means" nor do they use  the non-structural generic placeholder such as "device for."  *See*, *e.g.*, *Williamson*, 792 F.3d at 1349 (Fed. Cir. 2015); M.P.E.P 2181.  Samsung cannot meet its burden to overcome the presumption that the term "data exchange device" is not a mean-plus-function term. *Zeroclick*, 891 F.3d at 1007.

Here, the claim language describes "data exchange device" as a definite structure to a POSITA.  *See* Miller Dec. Ex. 3 at ¶ 35.  For example, claim 1 of the '333 Patent states, in part, that: "said data transceiver being for exchanging data between said electronic circuit and an external data exchange device."  Similarly, claim 1 of the '294 Patent states, in part, that "first data transceiver being for exchanging data between said electronic circuit and a first external data

exchange device over a first communication link."  It should be undisputed from the language of the claim that an "external data exchange device" is a definite structure that communicates with the portable electronic device as data is exchanged between the device's electronic circuit and the data exchange device.

Further, the specification here demonstrates that the term "data exchange device" is a structural limitation because it (a) provides examples of a definition of the term, *see MTD Products*, 933 F.3d at 1342; (b) provides examples of "what structures or class of structures fall within the definition of the term," *see Diebold Nixdorf, Inc. v. Int'l Trade Comm'n,* 899 F.3d 1291, 1298 (Fed. Cir. 2018); and (c) describes how the term interacts with other components of the invention.  *Williamson*, 792 F.3d at 1351.  Here, the specification defines and recites what structures fall within the definition of the term "data exchange device":

> Data exchange device 9 can be any sort of data exchange device comprising an electronic circuit (not shown) therein and a data transceiver 9 a therein able to cooperate with transceiver 18 of device 10. In one embodiment, data exchange device 9 is another portable electronic device 10. Data exchange device 10 can alternately be a computer, an interface machine such as an automatic teller machine, or any other suitable data exchange device.

Miller Dec. Ex. 1 at 5:47-54; *see also* Miller Dec. Ex. 2 at 13:12-41.  G. Holding's expert, Dr. Balakrishnan, confirmed that the specification defines the term "data exchange device" and provides a class of structures, such as a device comprising an electronic circuit and data transceiver that is able to cooperate with the transceiver of the portable electronic device, another electronic device, computer, server, terminal, interface machine, or an automatic teller machine, that fall within the definition of the term.  *See* Miller Dec. Ex. 3  at ¶ 35.  Moreover, Samsung's expert, Dr. Akl, also acknowledges that the specification of the Asserted Patents recites a structure for the "data exchange device.  *See* Miller Dec. Ex. 6 at ¶¶ 57-58.

18

The specification also describes how the "data exchange device" interacts with other structural components of the invention, which further demonstrates that the term recites sufficiently definite structure. *See Williamson*, 792 F.3d 1339.  The specification, including the figures, generally describe how the "data exchange device 9" interacts and connects with other structural components of the inventions, such as "electronic device 10," "switching element 44b," "transceiver 18," and "transceiver 9 a."  For example, the specification describes that "electronic device transceiver 18 can be any suitable emitting and receiving device capable of communication with the data exchange device transceiver 9 a" (*See* Miller Dec. Ex. 1 at 5:55-64) and "data exchange may be in the form of a data download from electronic device 10 to data exchange device 9, of a data upload to electronic device 10 from data exchange device 9, or of a data download and a data upload.  *See*, *e.g.*, Miller Dec. Ex. 1 at 5:55-65; 6:59-7:3.  The specification further describes an exemplary embodiment in which the "data exchange device" is a "payment debit machine 9" that "sends a confirmation of right-of passage to payment card 10" and "sends the required information to an exterior passage control device to allow passage of the cardholder to the public transportation services."  *See*, *e.g.*, Miller Dec. Ex. 1 at 7:55-8:23.  Figures 1 and 3 of the '333 and '294 Patents illustrate an established communication link between the portable electronic device and the data exchange device.  *See*, *e.g.*, Miller Dec. Ex. 1 at Fig. 1; Fig. 3; 4:14-23; 9:26-56.  Figure 4 of the '294 Patent and Figures 1 of the '333 and '294 Patents illustrate an established communication link between the "portable electronic device 102" and more than one data exchange device 108, 109, and 110.  *See*, *e.g.*, Miller Dec. Ex. 2 at Fig. 4; 13:25-32.

The absence of the words "means" from the claim term "data exchange device" creates a presumption that § 112 ¶ 6 does not apply and Samsung cannot carry its burden to rebut that presumption.  The intrinsic evidence of the Asserted Patents demonstrates to a POSITA that the

term "data exchange device" has a sufficiently definite meaning as the name for the structure.

Accordingly, Samsung's proposal to construe the term pursuant to § 112 ¶ 6 should be rejected,

and the term should be afforded its plain and ordinary meaning as described in the specification.

### D. "invariable activation command" ('333 Patent, Claims 1 and 11; '294 Patent, Claims 1, 12, and 18)

| G. Holdings' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "a state-dependent command that is issued in response to the control device input" | "a command initiating one of two alternate data conveyance operations" |

Defendants' construction attempts to impermissibly import limitations into the definition

of this claim term.  The language of the specification explains that the "invariable activation

command" is issued when a user triggers the control device.  *See* Miller Dec. Ex. 1 at 5:5-39; 7:4-

54; *also see* Miller Dec. Ex. 2 at 8:29-63; 10:26-11:9; 11:54-12:18; 15:14-18; 16:24-46;

16:66-18:59.  How that "invariable activation command" is used depends on the state as

determined by the presence or absence of an activation cue.  *Id.*  Specifically, the patent explicitly

states:

> The **same invariable activation command** will thus be issued upon control device
> 12 being triggered, and it is the **state** of switching element 44b, resulting from the
> receipt or non-receipt of activation cue by portable electronic device 10, that **will
> be decisive** as to the type of data conveyance that will occur.

Miller Dec. Ex. 1 at 7:24-29 (emphasis added).  The "invariable activation command" is a

command the result of which is state-dependent.  *Id.*  And what happens next with the "invariable

activation command" based on that state is defined by the language of the claims.  There is no need

to attempt to read any of those other potential aspects of the claim into the definition.

Defendants' proposed construction attempts to import limitations relating to how the

command is later used.  In fact, the specification support that Defendants rely on for their proposed

definition, describes not what an invariable activation command is, but how it may be used in one

of the embodiments.  *See*, *e.g.*, Miller Dec. Ex. 1 at 7:4-7.  As the claim clearly recites how the "invariable activation command" is used, any attempt to try to import its potential use into the definition is duplicative and potentially confusing to a finder of fact.

A POSITA would appreciate that an "invariable activation command" is simply a command that is issued in response to the control device input, the use of which depends on the state of the device.  *See* Miller Dec. Ex. 3 at ¶ 36.  Accordingly, G. Holdings requests that the Court adopt its construction.

**E.** **"a control device operatively linked to said electronic circuit, with an invariable activation command being issued when said control device is selectively triggered" ('333 Patent Claim 1)**

**"wherein upon said control device being selectively triggered to issue and [*sic*] invariable activation command" ('333 Patent Claim 1)**

**"a user-triggered control device operatively linked to said electronic circuit, said user-triggered control device configured to be operated by a user via one of a button, a keypad, a tactile screen, and a biometric parameter detector, and after being operated issue an invariable activation command, with said invariable activation command being issued when said control device is selectively triggered by the user" ('294 Patent Claim 1)**

**"a user-triggered control device operatively linked to said electronic circuit, said user-triggered control device configured to be operated by a user via one of a button, a keypad, a tactile screen, and a biometric parameter detector, and after being operated issue an invariable activation command, with said invariable activation command being issued when said control device is triggered by the user" ('294 Patent Claim 10)**

**"wherein upon said control device being selectively triggered by the user to issue said invariable activation command" ('294 Patent Claims 1 and 10)**

| G. Holdings' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not indefinite.  The claim element contains permissible functional limitations that describe the apparatus by reciting its capabilities. *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1313 (Fed. Cir. 2017). | Indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). |

| "wherein upon said control device being selectively triggered to issue and [sic] invariable activation command" means "wherein upon said control device being selectively triggered to issue an invariable activation command" | |

Claim 1 of the '333 Patent and claims 1 and 10 of the '294 Patent should be afforded their ordinary meaning, which is clear from the plain language of the claims read in light of the specification.  Because a POSITA can determine the scope of the claims with reasonable certainty, Samsung cannot show by clear and convincing evidence that the claims are indefinite.  *See* Miller Dec. Ex. 3  at ¶ 38.

Defendants contend that '333 Patent claim 1 and '294 Patent Claims 1 and 10 are indefinite hybrid apparatus/method claims under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005).  Federal Circuit decisions after *IPXL Holdings* clarify that the critical inquiry is whether the claim language makes it "unclear whether infringement … occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner].  *UltimatePointer, L.L.C. v. Nintendo Co.* , 816 F.3d 816, 826 (Fed. Cir. 2016).  Further, the mere use of functional-like language in an apparatus or system claim does give rise to indefiniteness under *IPXL Holdings*.  *See Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ("Functional language may also be employed to limit the [apparatus] claims without using the means-plus-function format.").  Further, the Federal Circuit's decision in *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307 (Fed. Cir. 2017) distinguished between invalid claims that describe an apparatus and method for using it (as in *IPXL Holdings*) and valid claims that describe an apparatus using functional language (as here).  *Id*. at 1313-14.

Samsung cannot show, by clear and convincing evidence, that claim 1 of the '333 Patent and claims 1 and 10 of the '294 Patent are indefinite based on *IPXL Holdings* rational.  Claim 1 of the '333 Patent is directed to "[a] portable electronic device" that includes "a control device" that is further defined as having specific functionality.  For example, the control device is configured to issue an activation command that triggers a data conveyance operation when pressed or interacted with (*e.g.*, selectively triggered).  Similarly, claims 1 and 10 of the '294 Patent are directed to "[a] cellular phone" that includes "a user-triggered control device" that is further defined as having specific functionality.  For example, the "user-triggered control device" is configured to include either a button, a keypad, a tactile screen, or a biometric parameter detector that, when pressed or interacted with, issues an activation command that triggers a data conveyance operation.  This is proper functional language under *MasterMine* because the claimed apparatus "possess[es] the recited structure [which is] capable of performing the recited functions," *id*. at 1316, and "do not claim activities performed by the user."  Conversely, the language in the disputed claim in *IPXL Holdings* was not related to any structural component, nor did it describe the functionality or capability of a recited component or system.  *See IPXL Holdings*, 430 F.3d at 1384

Here, the claims do not require an act by the user for infringement; instead, the claims are infringed if a product with a "control device" or "a user-triggered control device" capable of performing the recited function (*e.g.*, issue an activation command that triggers a data conveyance operation) in an operative environment.  *MasterMine Software, Inc.*, 874 F.3d at 1316 (finding claims inform those skilled in the art about the scope of the invention with reasonable clarity because they "merely use permissible functional language to describe the capabilities of the claimed system [and] it is clear that infringement occurs when one makes, uses, offers to sell, or

sells the claimed system"). Thus, there is no uncertainty about when infringement would occur, as it plainly occurs when a system is created that can perform the specific functions. Therefore, claim 1 of the '333 Patent and claims 1 and 10 of the '294 Patent are not indefinite and should be afforded their plain and ordinary meaning, which includes the correction of the typographical error where the "and" in the claims should be replaced with "an."

### F.  "conveyed toward a close proximity" ('294 Patent Claims 8 and 16)

| G. Holdings' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite |

The phrase "conveyed toward a closed proximity" should be afforded its ordinary meaning, which is clear from the plain language of the claims and the specification. Samsung alleges the '294 Patent Claims 8 and 16 are unclear as to the scope of "conveyed toward a close proximity" and that this phrase is therefore indefinite. Because a POSITA can determine the scope of the phrase (and the claims) with reasonable certainty, Samsung cannot show by clear and convincing evidence that the phrase is indefinite.

The plain language of the claim and specification provide proper guidance for the phrase "conveyed toward a close proximity" and it is therefore not indefinite. In fact, a POSITA reading the claim in the context of the entire patent, including the specification, would understand that the phrase has objective boundaries well-defined by the apparatus and method's capabilities. *See* Miller Dec. Ex. 3 at ¶ 37. *See*, *e.g.*, *Evicam Int'l, Inc. v. Enforcement Video, LLC*, No. 4:16-cv-105, 2016 WL 6470967, at *18-19 (E.D. Tex. 2016) (finding "the term 'large' is sufficiently clear from the context of the claims as referring to storage capacity that is at least large enough to be useful for storing surveillance video"); *Chrimar Sys., Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:15-CV-163-JDL, 2016 WL 1237156, at *4 (E.D. Tex. Mar. 28, 2016) (finding that "'detection

protocol' can be understood by a person of ordinary skill in the art with reasonable certainty in view" of the intrinsic evidence, even though the specification "does not use the terms 'detection protocol' or 'protocol.'"). For example, the specification describes various embodiments illustrating that the specific proximity will depend on the design of the electronic device and the data exchange device  and the allowable range within which the cellular phone and data exchange device can interact. *See*, *e.g.*, Miller Dec. Ex. 2 at 11:10-63 (discussing an exemplary public transposition fare payment situation and stated that "[u]pon the cardholder ***approaching his payment card within a range allowing it to receive the activation cue from the debit machine***, he could then trigger his control device"). The specification further provides that:

> In one embodiment, first data transceiver 120 is a proximity transceiver ***that allows data transmission within a limited range, such as within several meters for example***. The step of forwarding first data to first transceiver 120 is then for initiating a wireless data exchange operation with a proximate first external data exchange device 104 through a direct link. In such a case, first data exchange device 104 may also be a proximity device ***allowing data exchange within a limited range through a corresponding direct link***.

Miller Dec. Ex. 2 at 15:55-63 (emphasis added). The specification further explains that:

> In the case where the transaction occurs with a proximity data exchange device 104 the user confirmation input device could include a proximity trigger device that establishes wireless contact to download information when portable electronic device 102 is ***brought within a determined maximum distance from data exchange device*** 104.

*Id*. at 16:41-46 (emphasis added). The description in the specification is consistent with claims 8 and 16 of the '294 Patent that provide for a "communication link where the cellular phone is ***conveyed toward a close proximity*** of the first external data exchange device ***and within a range to receive the activation cue to initiate the wireless data exchange***."

A POSITA reading the claim language and specification would understand with reasonable certainty that the phrase "conveyed toward a closed proximity" has objective boundaries well-

defined by the apparatus and method's capabilities.  *See* Miller Dec. Ex. 3 at ¶ 37.  Specifically, a

POSITA would understand that both the cellular phone and the data exchange device would have

a range, and transactions in a proximity system, as described in the specification, depend on the

range of the cellular phone and the data exchange devices overlapping such that communication

between the systems can occur.  *Id*.  As such, Samsung cannot show indefiniteness by clear and

convincing evidence.  Defendants cannot prove clearly and convincingly that the phrase is

indefinite because the phrase plainly refers to the maximum allowable range within which the

portable electronic device and data exchange device can interact.

### G.  "upon" ('333 Patent Claim 1; '294 Patent Claims 1 and 10)

| G. Holdings' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | Plain and ordinary meaning (*i.e.*, "when") |

G. Holdings proposed a plain and ordinary meaning construction for this straightforward

term.  "Upon" is sufficiently clear and understandable by either a POSITA or a lay fact finder such

that no construction is necessary.  As is the case here, where the plain and ordinary meaning would

be clear, additional construction of a claim term is not to be necessary to assist the fact finder in

understanding the claims.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir.

1997) (Court need not always render a construction of claim terms where such construction would

not add clarity over and beyond the plain words used in the claim); *O2 Micro Int'l Ltd. v. Beyond*

*Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008) (The goal in claim construction is to

help the fact-finder, typically a lay jury, understand the claims).  Any proposed construction of

such a simple word could introduce a variant meaning that loses the nuance of the term.  To the

extent Samsung is attempting to read an order of steps by including temporal limitations, such a

proposal is inconsistent with the claim language as the apparatus claim does not expressly and

inherently exclude additionally, unrecited elements or a required operation order.   *See*, *e.g.*, *Creative Internet Advert. Corp. v. Yahoo! Inc.,* No. 07-cv-00354, 2008 WL 5061625, at *16 (E.D. Tex. Nov. 24, 2008) (generally improper to "import a sequential limitation into an apparatus claim").

H. **"wherein upon said control device being selectively triggered to issue and invariable activation command:**
**if said switching element is in said activated state, a data exchange will be initiated through the instrumentality of said data transceiver for exchanging data between said electronic circuit and an external data exchange device;**
**if said switching element is in said inactive state, data will be conveyed from said electronic circuit to said user interface device for communicating information to the portable electronic device holder." ('333 Patent Claim 1)**

**"wherein upon said control device being selectively triggered by the user to issue said invariable activation command:**
**if said switching element is in said first state, a first data conveyance operation will be initiated through the instrumentality of said first data transceiver for sending data from said electronic circuit to the first external data exchange device over said first communication link; and**
**if said switching element is in said second state, a second data conveyance operation will be initiated through the instrumentality of said second data transceiver for sending data from said electronic circuit to the second external data exchange device over said second communication link." ('294 Patent Claim 1)**

**"wherein upon said control device being selectively triggered by the user to issue said invariable activation command:**
**if an activation cue was received by said cue receiver, said electronic circuit will accomplish said first data conveyance operation to convey data from said electronic circuit to said first data transceiver for transmitting data through said first data transceiver; and**
**if no activation cue was received by said cue receiver, said electronic circuit will accomplish said second data conveyance operation to convey data from said electronic circuit to said second data transceiver for transmitting data through said second data transceiver."**
**('294 Patent Claim 10)**

| G. Holdings' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning.  No construction necessary. | Plain and ordinary meaning, which requires that the data conveyance operation occurs when the control device is triggered and |

27

| | without waiting for an activation cue |
|---|---|

The parties agree that the phrases should be given their plain and ordinary meaning but Defendants further propose inserting some additional, unsupported, negative limitations that are expressly at odds with the intrinsic record.  There is no support in the language of the claims and there is no support in the intrinsic record for Defendants' proposal that the disclosed elements of these apparatus claims are required to interact in only one specific way—namely that, as Defendants' propose, the apparatus cannot wait for an activation cue upon the triggering of the control device.

The identified elements of apparatus claim 1 of the '333 Patent and apparatus claims 1 and 10 of the '294 Patent are instructive as to the "if…else" branching that occurs based on the state of the device.  Nothing in the language of these apparatus claims contemplate or explicitly require a specific order of the steps or a sequential process.  *See*, *e.g.*, *Creative Internet Advert. Corp. v. Yahoo! Inc.,* No. 07-cv-00354, 2008 WL 5061625, at *16 (E.D. Tex. Nov. 24, 2008) ("apparatus claims recite structure—not steps or processes" generally improper to "import a sequential limitation into an apparatus claim").  Rather, the claims are directed to a portable electronic device that includes, among other things, a control device and a switching element and recites additional structure (*e.g.*, if/else logic) comprising the switching element.

Nevertheless, Defendants are attempting to incorporate its "order of the steps" argument from the method claims into these apparatus claims.  And as previously discussed, Defendants' proposed construction should be rejected because it would exclude embodiments disclosed in the Asserted Patents.  *SynQor, Inc*., 709 F.3d at 1378-79.  The specification and prosecution history of the '294 Patent explicitly envisions embodiments where the user-triggered invariable activation command is issued and then an activation cue is later received to determine the data conveyance

28

path.  *See* Miller Dec. Ex. 2 at  18:7-59, see also Miller Dec. Ex. 4 at p. 12, see also Miller Dec. Ex. 5 at p. 15.

Defendants' expert, Dr. Akl, provides no explanation for why these apparatus claims should be read according to the "order of the steps" analysis he proposed with regard to the method claims.  And Dr. Akl also provides no credible reason why he alleges that the claims would be indefinite if no "order of the steps" is imported into these apparatus claims.

## VI.    CONCLUSION

To the extent that the Court determines that the terms require construction, G. Holdings requests that the Court adopt its proposed constructions because its proposed constructions more closely adhere to the language set out in the Asserted Patents and represent how these terms would be understood by a person of skill in the art.

Dated:  April 14, 2021                                      Respectfully submitted,

By: */s/ Edward R. Nelson III*
Edward R. Nelson III
ed@nbafirm.com
Christopher G. Granaghan
chris@nbafirm.com
**NELSON BUMGARDNER**
**ALBRITTON PC**
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
T: (817) 377-9111
F: (817) 377-3485

Rodney R. Miller
Texas Bar No. 24070280
Admitted in this District
rmiller@hallboothsmith.com
Gaylon Hollis
Georgia Bar No. 653106
(*Admitted Pro Hac Vice*)
ghollis@hallboothsmith.com
**HALL BOOTH SMITH, P.C.**
191 Peachtree Street NE, Suite 2900

Atlanta, GA 30303
T:  404.586.6601
F:  404.954.5020

Daniel C. Miller
New York Bar No. 4232773
(*Admitted Pro Hac Vice*)
dmiller@hallboothsmith.com
**HALL BOOTH SMITH, P.C.**
366 Madison Ave, Fifth Floor
New York, NY 10017
T:  917.805.2460

Karl Braun
Tennessee Bar No. 022371
(*Admitted Pro Hac Vice*)
kbraun@hallboothsmith.com
**HALL BOOTH SMITH, P.C.**
424 Church, Suite 2950
Nashville, TN 37219
T:  615.313.9911

*Counsel for Plaintiff G. Holdings Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been

served on all counsel of record via electronic mail on this 14th day of April, 2021.

*/s/ Edward R. Nelson III*